

Attorneys at Law

Representing Management Exclusively in Workplace Law and Related Litigation

Jackson Lewis LLP
58 South Service Road
Suite 410
Melville, New York 11747
Tel 631 247-0404
Fax 631 247-0417
www.jacksonlewis.com

| | | | |
|---|---|---|---|
| ALBANY, NY | DETROIT, MI | MINNEAPOLIS, MN | PORTSMOUTH, NH |
| ALBUQUERQUE, NM | GREENVILLE, SC | MORRISTOWN, NJ | PROVIDENCE, RI |
| ATLANTA, GA | HARTFORD, CT | NEW ORLEANS, LA | RALEIGH-DURHAM, NC |
| AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | RICHMOND, VA |
| BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SACRAMENTO, CA |
| BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAINT LOUIS, MO |
| BOSTON, MA | LAS VEGAS, NV | ORANGE COUNTY, CA | SAN DIEGO, CA |
| CHICAGO, IL | LONG ISLAND, NY | ORLANDO, FL | SAN FRANCISCO, CA |
| CINCINNATI, OH | LOS ANGELES, CA | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | MEMPHIS, TN | PHOENIX, AZ | STAMFORD, CT |
| DALLAS, TX | MIAMI, FL | PITTSBURGH, PA | WASHINGTON, DC REGION |
| DENVER, CO | MILWAUKEE, WI | PORTLAND, OR | WHITE PLAINS, NY |

MY DIRECT DIAL IS: 212.545.4073
MY EMAIL ADDRESS IS: MELLKW@JACKSONLEWIS.COM

February 4, 2013

**VIA ELECTRONIC CASE FILING**

Hon. Magistrate Judge Cheryl L. Pollak
United States District Court
Eastern District of New York
225 Cadman Plaza, Rm. 1230S
Brooklyn, New York 11201

          Re:   *Quartey v. Schiavone Construction Co., LLC, et al.*
               Case No.: 11-cv-2037 (DLI)(CLP)

Your Honor:

     As counsel for Defendants Schiavone Construction Co., LLC, Schiavone Contracting Corp. and John P. Picone, Inc. ("Defendants") in the above referenced matter, we write in opposition to Plaintiff's January 26, 2013 pre-motion letter seeking to compel discovery.[1]

     As evidenced by his latest submission, Plaintiff continues his campaign of altering the theory of his case when the need suits him. In his Complaint, Plaintiff claims he was allegedly hired by Defendants as a foreman to perform certain drilling and blasting work at the Capital Project WM-11 project located at the Croton Water Treatment Plant. Plaintiff alleges that the crew hired to perform this work consisted of a mixture of Black and "Italian American" workers. Plaintiff further claims that after the drilling phase of the project was completed, but before the blasting work was scheduled to begin, Defendants terminated the employment of Plaintiff and the other Black crewmembers, and then hired "Italian American" workers as replacements. During the course of discovery, Plaintiff altered his allegations and stated that all Black workers were replaced by "light skinned" workers, and that he personally classifies all "light skinned" workers as "Italian Americans," regardless of whether they are actually Black or Hispanic. Plaintiff then testified that his replacement (Mr. Barahona) is not light-skinned. Now, in his latest submission, Plaintiff claims that he was discriminated against because he was replaced with a "White or Hispanic" worker (Mr. Barahona). Such inconsistent allegations evidences that Plaintiff's claims completely lack merit. At every juncture he has revised his claims, and, in what can only be described as a fishing expedition, has sought additional discovery several times since the inception of this action nearly two years ago. Indeed, the discovery thus far produced in this matter unequivocally establishes that there is no evidence of race discrimination.

**November 16, 2012 Court Conference:**

     During the course of Mr. Streichenwein's deposition, he testified that he was not impressed by Plaintiff's performance as blaster on a Schiavone job site in 2005 (a separate and independent job from

---

[1] Plaintiff's counsel's representation that he made a good faith effort to comply with F.R.C.P Rule 37(1) is without merit. Plaintiff's counsel left the undersigned a voicemail at 5:53 p.m. on Thursday, January 24, 2013. I was unable to return his call on January 25th due to pending commitments on that date. Plaintiff's counsel did not attempt to reach Mr. Domanick, email me or otherwise communicate before filing the instant motion on Saturday, January 26, 2013.


Attorneys at Law

Hon. Magistrate Judge Cheryl L. Pollak
February 4, 2013
Page 2

the JV for whom Plaintiff worked in 2010[2]), and did not suggest Plaintiff be hired for the blasting phase of the Croton project. During the November 16th conference before Your Honor, Ms. Wade indicated a desire to serve additional discovery demands or a subpoena to explore the issue of a particular blast referenced by Mr. Streichenwein at deposition regarding a destroyed temporary sewer line. There was no discussion regarding additional demands concerning the South Ferry job in general, the entire blasting crew at the South Ferry job (who were not considered for, or relevant to, Plaintiff's employment by the JV), or Mr. Barahona's job performance (all which is irrelevant to Plaintiff's instant claim). A review of Plaintiff's latest discovery demands evidences that he is attempting to go well beyond the scope of any putative discovery discussed during the November 16, 2012 conference. Moreover, while Plaintiff was permitted to serve late discovery requests, there was no discussion of the propriety of the requests or Defendants' ability to challenge Plaintiff's third set of discovery.[3]

**Defendants' Responses to Plaintiff's Third Combined Set of Discovery Demands:**

**Procedural Issues:**

While Plaintiff sees it fit to pepper his submission with unprofessional slights, Defendants will only respond to the legal issues raised therein. First, regarding the timing of Defendants' response, Defendants advised Plaintiff's counsel, in writing, they would need additional time to respond to the demands because the undersigned was on trial (before District Court Judge Feuerstein in the Eastern District of New York). On January 7th, we emailed Ms. Wade and advised her of this request. In addition, Plaintiff's counsel accusation that Defendants did not serve the responses on January 16th as sworn to on the Certificate of Service are unfounded and inappropriate as Mr. Domanick did indeed serve the responses as so indicated. Regarding counsel's allegations of gamesmanship concerning the manner of service, Defendants are under no obligation to serve responses in any particular manner. Defendants complied with their obligations by serving discovery responses in a routinely accepted manner. In addition, with regard to the interplay between the discovery responses and Defendants' pre-motion letter to Judge Irizarry, Plaintiff's characterization of Defendants' actions with regard to the filing of the pre-motion letter are without merit. Defendants note that they filed a pre-motion letter for summary judgment based on the schedule Your Honor issued. Defendants did not intend to engage in any "gamesmanship," but rather, sought only to comply with the Court's Order and did so in good faith.

**Substantive Issues:**

As discussed above, rather than limit his <u>third</u> combined set of discovery demands to the issue regarding the destroyed sewer line (which Mr. Streichenwein already testified about during his deposition, and which was an event that occurred in 2005--five years before Plaintiff's instant claim arose, and six years before he commenced the instant action), Plaintiff expanded the scope of his

---

[2] Plaintiff's instant claims arise out of his employment with a Joint Venture (an entity independent from Defendants Schiavone and Picone).

[3] Mr. Streichenwein provided the above-referenced testimony on October 3, 2012. Plaintiff did not indicate a desire to obtain additional information regarding the destroyed sewer line until the November 16th Court conference. If Plaintiff really believed the stated reason for his not being considered for the blasting phase of the Croton project (the destroyed sewer line) was untrue, he would have sought additional discovery regarding this issue immediately. Indeed, Plaintiff was made aware of concerns about Plaintiff's performance during the depositions of Defendants' other witnesses, which occurred in June 2012. See Ex. B; Bateman Dep. 39-40.



Hon. Magistrate Judge Cheryl L. Pollak
February 4, 2013
Page 3

proposed demands and seeks, *inter alia*, information regarding <u>all</u> blasters at the South Ferry job, <u>all</u> work reports regarding all the blasting at the South Ferry job, <u>all</u> documents concerning Plaintiff's job performance at the South Ferry job, <u>all</u> documents concerning Mr. Barahona's work performance at the South Ferry job, and <u>all</u> photographs of all blasts performed by Mr. Barahona at the South Ferry job.[4] Clearly, these demands are overbroad, unduly burdensome, and outside the scope of the discussion during the November 16, 2012 conference. Documents concerning any blaster other than Plaintiff simply are irrelevant and will not lead to discovery of admissible evidence concerning Plaintiff's instant claims. There is no evidence that anyone else was considered for the position other than Plaintiff or Mr. Barahona. With regard to Mr. Barahona, Mr. Streichewein testified that he had worked with Barahona subsequent to South Ferry and thought he was a capable blaster. Simply put, the requests concerning Barahona's performance at South Ferry (all documents concerning his performance, satisfactory or unsatisfactory) will not lead to any evidence concerning Plaintiff's claims.

As to documents concerning Plaintiff, the requests also are overbroad, unduly burdensome, do not allow Defendants to sufficiently identify what documents Plaintiff is looking for and is not calculated to lead to the discovery of admissible evidence. Faced with the realization that there is no evidence demonstrating that his layoff did not occur under circumstances that give rise to an inference of discrimination, Plaintiff seeks to force Defendants to engage in the onerous process of obtaining and reviewing documentation regarding a job site wholly unrelated to this action, work that occurred over 7 years ago on a project lasting several years, involving an untold number of blasting employees that are not even tangentially related to this action, and concerning an innumerable number of blasts. Plaintiff's requests can be seen as nothing less than an attempt to force Defendants to shoulder an unreasonable burden in discovery with the hope that Plaintiff will somehow obtain a shred of evidence giving credence to his claims of discrimination (something he has not been able to establish to date). Simply put, Plaintiff is engaging in a fishing expedition, which is highlighted by all discovery to date, and, in particular, by Plaintiff's own deposition testimony. Plaintiff testified at his deposition that 1) Mr. Streichenwein never said anything disrespectful to him; 2) that he had a good relationship with Mr. Streichenwein; and, <u>most significantly,</u> 3) he had "couldn't pinpoint who discriminated against him" and that he had "no facts to support his claim" (Pl. Dep. 166-68; 61-63; 195-96, *see* Exhibit A). It simply is unreasonable for Plaintiff to request this extensive discovery with the hope that he will discover something that will refute this evidence. *See 287 Franklin Ave. Residents' Ass'n v. Meisels*, No. 11–CV–976, 2012 U.S. Dist. LEXIS 72855, at *15 (E.D.N.Y. May 24, 2012) ("'The locus of the line between discovery reasonably calculated to lead to admissible evidence and the proverbial fishing expedition is determined in large measure by the allegations of the pleading.'" (internal citations omitted); *Tottenham v. Trans World Gaming Corp.*, No. 00 Civ. 7697, 2002 U.S. Dist. LEXIS 11313, at *3–4, 2002 WL 1967023 (S.D.N.Y. June 21, 2002) ("Discovery ... is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.... Discovery requests cannot be based on pure speculation or conjecture.").

The individual who possesses the relevant information regarding the South Ferry incident, Mr. Streichenwein, already provided deposition testimony. While Plaintiff is free to disagree with the testimony, Defendants should not be required to engage in extensive additional discovery constituting a fishing expedition in a case with no evidence of discrimination. Accordingly, Defendants respectfully request Your Honor deny Plaintiff's application and his request for costs and fees.

---

[4] Defendants' note that Plaintiff did not ask Mr. Streichenwein whether any records were made, or existed, regarding these events.



Hon. Magistrate Judge Cheryl L. Pollak
February 4, 2013
Page 4

       Counsel remains available should Your Honor require additional information regarding this submission.

       Respectfully submitted,
JACKSON LEWIS LLP

*Wendy Mellk*

Wendy Mellk


TD:mf

cc: Theresa Wade, Esq. (*via* ECF)


4851-0767-9250, v. 1

# EXHIBIT "A"

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------------

BEN QUARTEY,

                Plaintiff

  -versus-

SCHIAVONE CONSTRUCTION CO. LLC,

SCHIAVONE CONTRACTING CORP.,

JOHN P. PICONE, INC., WDF

DEVELOPMENT LLC, WDF, INC.,

                Defendants.

------------------------------------------


       DEPOSITION OF BEN QUARTEY, the Plaintiff herein, taken at the offices of Jackson Lewis, LLP, 666 Third Avenue, New York, New York 10017, on May 21, 2012, at 10:00 a.m., before Robert Bloom, a Shorthand Reporter and notary public, within and for the State of New York.

```
                                                              61
 1                    B. Quartey
 2           Who was the blaster in charge?
 3     A.    Willy Banks.
 4     Q.    So you were on a crew of blasters
 5  underneath Willy Banks?
 6     A.    Yes.
 7     Q.    Is Willy Banks white or black?
 8     A.    Black.
 9     Q.    And did you have any dealings
10  with the Schiavone PMs or engineers when
11  you were on the South Ferry site?
12     A.    No.
13     Q.    You went through Willy for
14  everything?
15     A.    Yes.
16     Q.    And how did it come about that
17  you went from Van Cortlandt to South Ferry?
18     A.    I was sent from there.
19     Q.    Sent by whom?
20     A.    One of the blasters on the site.
21     Q.    One of the blasters at the Van
22  Cortlandt site?
23     A.    Yes.  Through Jimmy Dynamite.
24     Q.    So somebody said:  We need help
25  over at South Ferry?
```

                                                          62
1                     B. Quartey
2        A.    Jimmy told me that they needed a
3   powder carrier at South Ferry to help.
4        Q.    You were powder carrier at South
5   Ferry, too?
6        A.    No, I was there as a blaster.  I
7   went as a powder carrier and I became a
8   blaster.
9        Q.    How long were you at the South
10  Ferry site?
11       A.    Close to eight to one year or so.
12       Q.    Between eight months and a year,
13  around?
14       A.    I believe so.
15       Q.    Why did they call Freddy, Freddy
16  Starbucks, do you know?
17       A.    That's a nickname we have for
18  him.  I always try to put his last name in
19  my mind.  I don't know.
20       Q.    Did you ever call him that to his
21  face?
22       A.    I call him Freddy.
23       Q.    So you and Freddy spoke, Freddy
24  knew who you were?
25       A.    Yes.

                                                                  63
                       B. Quartey
    Q.    Did you have a good relationship
with him?
    A.    Yes.
    Q.    And why did you leave Schiavone?
    A.    Lack of work.
    Q.    Am I correct that you get hired
by a construction company, whether you
shape the job, or whether the union sends
you, or whether somebody calls you, you go
and you perform a particular function and
when that particular function is done, your
role at the company is done, correct,
there's no more work to be done, you keep
on saying lack of work?
          MS. WADE:  Objection to form.
          You can answer.
    A.    Correct.
    Q.    Is my history correct?
    A.    Not all the time.
    Q.    So far for all the examples that
we have talked about, with Yonkers, with
Phoenix, with Tudor Perini, with Schiavone
you were hired, either through shaping or
somebody called you through the union,

```
                                                                  166
 1                      B. Quartey
 2   disrespectful?
 3       A.      No.
 4       Q.      How about Ben Bateman, did he
 5   ever say anything to you negative about how
 6   you were performing your job?
 7       A.      No.
 8       Q.      Did he ever say anything
 9   disrespectful?
10       A.      No.
11       Q.      Did you ever see Freddy Starbucks
12   on the job?
13       A.      He came on the job, I think one
14   time, and then the second time I saw him on
15   the job was when the blasting was going to
16   start.
17       Q.      Did you speak to him at either
18   time?
19       A.      I did spoke to him.
20       Q.      Did you speak with him the first
21   time he came on the job?
22       A.      Yes.
23       Q.      What did you say to him?
24       A.      He asked me what we're doing, I
25   explained to him, and that was it.
```

```
                                                               167
 1                      B. Quartey
 2       Q.    You explained to him --
 3       A.    What we were doing.
 4       Q.    That you were line and channel
 5   drilling?
 6       A.    Correct.
 7       Q.    Did he say anything to you
 8   negative at that time?
 9       A.    No, he didn't.
10       Q.    Did he say anything disrespectful
11   to you?
12       A.    No, he didn't.
13       Q.    When he was the blasting super at
14   South Ferry, did he ever say anything
15   disrespectful to you at that job?
16       A.    No, he didn't.
17       Q.    When he came onto the job the
18   first time and you saw him when you were
19   doing the channel and line drilling, was he
20   surprised to see you?
21       A.    He wasn't surprised.
22       Q.    He seemed to know you were there?
23       A.    I believe so.
24       Q.    And you said you saw him a second
25   time when the blasting had started.
```

```
                                                                      168
 1                        B. Quartey
 2              Did you speak to him that second
 3   time?
 4        A.    I came out and shook his hand and
 5   say hi to him and everybody.
 6        Q.    Did you know why he was there?
 7        A.    I had no clue.
 8        Q.    Do you know whether he was
 9   overseeing the blasting that was occurring?
10        A.    I have no clue.
11        Q.    Did you ask him why you weren't
12   blasting?
13        A.    I didn't ask him.
14        Q.    Other than those two times, did
15   you speak with Fred at any other time while
16   you were at the JV?
17        A.    No.  I didn't after that, I
18   didn't go back.
19        Q.    Have you seen him since you left
20   the JV?
21        A.    No.
22        Q.    Paragraph 19, it says from on or
23   about January 19, 2010 to March 14, 2010
24   you along with a crew performed drilling at
25   the project.
```

```
                                                                195
 1                    B. Quartey
 2      Q.    Who at the JV do you think
 3   discriminated against you?
 4      A.    I can't pinpoint who made that
 5   decision.  But that's what I feel happened
 6   to me.
 7      Q.    So that's your belief, correct?
 8      A.    That's my belief.
 9      Q.    Do you think that Mr. Ascolese
10   discriminated against you?
11      A.    If it's him, then yes.  If it's
12   not, I don't know who discriminated against
13   me.  But that's the way I was cut off from
14   the job.
15      Q.    So other than the fact that you
16   didn't perform the blasting, do you have
17   any other facts that would support your
18   belief that you were discriminated against?
19      A.    I think the fact of the matter is
20   if I happened to be a white guy, I would
21   remain on the job.  That's my belief, and
22   I still believe it up to now.
23      Q.    Other than the fact that you
24   didn't do the blasting, and that you think
25   if you were a white guy you would still be
```

```
                                                              196
 1                   B. Quartey
 2   on the job, any other facts that you have
 3   to support your claim that you were
 4   discriminated against?
 5       A.    I have no facts.  They know the
 6   reason why they do that.
 7       Q.    And who is "they" that you're
 8   referring to?
 9       A.    The company know the reason why
10   they did that, why they did it is the way I
11   feel.
12       Q.    And am I correct that if you had
13   done the blasting, your employment with the
14   company would have ended upon the
15   completion of the blasting project,
16   correct?
17       A.    It depends.  I don't know.
18       Q.    Am I also correct that the fact
19   that you didn't perform blasting on the
20   Picone/Schiavone JV, didn't negatively
21   impact your ability to perform blasting or
22   to get a job as a blaster, correct?
23           MS. WADE:  Objection to form.
24       A.    I went ahead and get another
25   blasting job.
```

# EXHIBIT "B"

Page 1

ORIGINAL Scanned NH JUN 29 2012

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - -x

BEN QUARTEY,

                                    Plaintiff,

                        11 CV 02037 (DLI)(CLP)

                -against-

SCHIAVONE CONSTRUCTION CO. LLC, SCHIAVONE
CONTRACTING CORP., JOHN P. PICONE INC., WDF
DEVELOPMENT LLC, WDF INC.,

                                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - -x

                    30 Vesey Street
                    New York, New York

                    June 4, 2012
                    10:00 a.m.

        EXAMINATION BEFORE TRIAL of BENJAMIN

BATEMAN, a witness on behalf of the Defendant

SCHIAVONE CONSTRUCTION CO. LLC, in the

above-entitled action, held at the above time and

place, pursuant to Notice, taken before JoAnn

O'Loughlin, a Notary Public of the State of New

York.

                      *    *    *

1          BATEMAN
2     Q    Aside from what you already testified to,
3    were there any other discussions that you heard or you
4    participated in with respect to whether Mr. Quartey
5    should be blasting on the job?
6          MS. MELLK:    Objection.
7          You mean other than he said there were a
8      number of conversations he had with Joe?
9          MS. WADE:    Yes.
10         MS. MELLK:    So you're talking about other
11     than those conversations?
12         MS. WADE:    No.
13    Q    Within those conversation, aside from what
14   you already testified to, was there anything else said
15   about Mr. Quartey with respect to the possibility of
16   him being the blaster on the job?
17    A    I had heard and I don't remember who from,
18   but I had heard that he had blasted on another job
19   prior, the South Ferry job and that he had made some
20   mistakes on that job.
21    Q    Who did you hear this from?
22    A    I can't remember.
23    Q    What did you hear about the mistakes that
24   he made on the South Ferry job?
25    A    I heard he shot some fly rock out of the

```
 1                      BATEMAN
 2   site and he hit a window of a building nearby.
 3        Q    Did it cause any damage to that building?
 4             MS. MELLK:  Objection.
 5        Q    I mean did you hear about any damage
 6   occurring to that building as a result?
 7        A    I heard it broke a window.
 8        Q    I see.
 9             What were the other mistakes, if any, that
10   you heard about on that South Ferry job?
11        A    That was it.
12        Q    Do you recall who you learned that from,
13   that he shot a rock out of the site and it hit a
14   window?
15        A    No, I don't remember.  I mean drilling
16   blasting in New York City is a tight-knit community,
17   everyone knows everything, so I don't remember where it
18   came from.
19        Q    So aside from that, do you recall anything
20   else that was discussed about Mr. Quartey with respect
21   to possible blasting on the site, on the project?
22        A    No, that was it.
23        Q    Do you recall whether there was any
24   discussions that Mr. Quartey should not be the blaster
25   on the project because of the mistake that he made at
```